## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

SILVIA MCCLAIN,

    *Plaintiff*,

*v.*                        CASE NO. 2:13-cv-14416

CAROLYN W. COLVIN          DISTRICT JUDGE LAWRENCE P. ZATKOFF
Commissioner of Social Security,     MAGISTRATE JUDGE PATRICIA T. MORRIS

    *Defendant*.

_____/

### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

## I.    RECOMMENDATION

    In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED** and that Defendant's Motion for Summary Judgment be **GRANTED**.

## II.    REPORT

### A.    Introduction and Procedural History

    Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing the Commissioner's decision denying Plaintiff's claim for Supplemental Security Income ("SSI")

---

[1]The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://www.uscourts.gov/RulesAndPolicies/JudiciaryPrivacyPolicy/March2008RevisedPolicy.aspx. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

under Title XVI, 42 U.S.C. § 1381 *et seq*. The matter is currently before the Court on cross-motions for summary judgment. (Docs. 10, 14.)

Plaintiff Silvia McClain first filed for benefits on August 26, 2003, alleging that she became disabled on August 1, 1999. (Tr. at 150.) The claim was denied initially. (*Id.*) Plaintiff asked for a hearing in front of an Administrative Law Judge ("ALJ"), who would consider the application de novo. (*Id.*) ALJ Peter N. Dowd convened the hearing on June 30, 2004. (Tr. at 150, 153.) In his decision dated September 1, 2006, the ALJ determined that she was not disabled. (*Id.*)

On February 1, 2011, Plaintiff filed the present claim for SSI, claiming that she became unable to work on June 1, 2002. (Tr. at 218.) The Commissioner considered whether Plaintiff had discogenic and degenerative back disorders, as well as affective disorders, and denied the claim at the initial administrative stage. (Tr. at 171.) Plaintiff appeared before ALJ Kathleen H. Eiler on May 17, 2012, for de novo review of her claim. (Tr. at 129-46.) In her decision issued June 29, 2012, the ALJ noted that absent new and material evidence that Plaintiff's condition deteriorated, she was bound by the prior ALJ determination that Plaintiff could perform a full range of light work. (Tr. at 122, 124.) She found that new evidence justified a more restrictive assessment of Plaintiff's capacities. (Tr. at 115-22.) Nevertheless, even under these restrictions, the ALJ found Plaintiff was not disabled. (Tr. at 110, 124.)

Two months later, Plaintiff requested a review of this decision. (Tr. at 105-06.) The ALJ's decision became the Commissioner's final decision, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on August 20, 2013, when the Appeals Council denied Plaintiff's request for review. (Tr. at 1-4.) On October 21, 2013, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision. (Pl.'s Compl., Doc. 1.)

**B.     Standard of Review**

The Social Security system has a two-tiered structure in which the administrative agency handles claims and the judiciary merely reviews the factual determinations to ensure they are supported by substantial evidence. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The administrative process provides multiple opportunities for reviewing the state agency's initial determination. The Plaintiff can first appeal the decision to the Social Security Agency, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137, 142 (1987). Once this administrative process is complete, an unsuccessful claimant may file an action in federal district court. *Sullivan v. Zebley*, 493 U.S. 521, 524-28 (1990), *superseded by statute on other grounds*, Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, 110 Stat. 2105; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction under 42 U.S.C. § 405(g) to review the Commissioner's final administrative decision. The statute limits the scope of judicial review, requiring the Court to "'affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.'" *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). The court's review of the decision for substantial evidence does not permit it to "'try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility.'" *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713 (6th Cir. 2012) (quoting *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (noting that the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'" (quoting *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence."))); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) ("[A]n ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely on an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "'there exists in the record substantial evidence to support a different conclusion.'" *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (quoting *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)). *See also Mullen*, 800 F.2d at 545. The court can only review the record before the ALJ. *Bass*, 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). *See also Jones*, 336 F.3d at 475. "[T]he . . . standard is met if a 'reasonable mind

might accept the relevant evidence as adequate to support a conclusion.'" *Longworth*, 402 F.3d at 595 (quoting *Warner*, 375 F.3d at 390). "The substantial evidence standard presupposes that there is a '"zone of choice"' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (quoting *Mullen*, 800 F.2d at 545).

A court's review of the Commissioner's factual findings for substantial evidence must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Van Der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x 521, 526 (6th Cir. 2006); *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("'[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.'" (quoting *Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999))).

## C.     Governing Law

"'The burden lies with the claimant to prove that she is disabled.'" *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 275 (6th Cir. 2010) (quoting *Foster*, 279 F.3d at 353). *Accord Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994)). There are several benefits programs under the Act, including the DIB program of Title II, 42 U.S.C. §§ 401-34, and the Supplemental Security Income ("SSI") program of Title XVI, 42 U.S.C. §§ 1381-85. Title II

benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty-stricken adults and children who become disabled. F. Bloch, *Federal Disability Law and Practice* § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston*, 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin*, 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work." *Jones*, 336 F.3d at 474. *See also Cruse*, 502 F.3d at 540. The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.    ALJ Findings

The first ALJ, in 2006, found at step one that Plaintiff had not engaged in substantial gainful activity since the application date; her earnings from a new part-time position starting in 2006 were too low to constitute gainful activity. (Tr. at 152.) Next, he determined she had carpal tunnel syndrome in both hands and cervical strain, but not diabetes or hernias because neither imposed functional work limitations. (*Id.*) At step three, he found that none of the impairments, alone or combined, met or equaled a listed impairment. (*Id.*) Articulating the residual functional capacity ("RFC") before the final steps, the ALJ found that Plaintiff could perform light work as the regulations defined it. (*Id.*); *see* 20 C.F.R. §§ 404.1567(b), 416.967(b). The ALJ ended the analysis at step four, finding Plaintiff could perform her past work as a personal care attendant. (Tr. at 153.)

7

Finding new evidence, the second ALJ came to different conclusions. (Tr. at 112-24.) Plaintiff had not performed substantial gainful activity since the application date; but again, clear evidence showed she worked past that date, despite her conflicting denials, earning wages below the substantial gainful activity threshold. (Tr. at 112-13.) A fresh set of severe impairments were listed at step two: "degenerative disc disease; diabetes mellitus; obesity; affective disorder; and anxiety disorder." (Tr. at 113.) At step three, the ALJ considered various listing but found that none matched or equaled Plaintiff's impairments. (*Id.*) The ALJ also crafted a new RFC, restricting Plaintiff to a limited range of light work. (Tr. at 115-22.) At step four, the ALJ found no past relevant work. (Tr. at 122.) Finally, at step five, the ALJ determined that Plaintiff was not disabled. (Tr. at 123-24.)

### E.    Administrative Record

### 1.    Medical Records

The first medical record is a vital signs flow sheet tracking various measurements from February to December 2010. (Tr. at 381, 501.) Pertinent to the present case, she generally rated her pain at level five, presumably out of ten, on a visual analog ("VA") sometimes it dipped to level four. (*Id.*) In February 2010 nurse practitioner Shauna Barbeau examined Plaintiff. (Tr. at 365.) The notes are difficult to decipher: they mention carpal tunnel surgery on Plaintiff's right hand, normal breathing, Plaintiff's request for Soma and Vicodin, chronic pain, depression, and insulin. (*Id.*) Plaintiff missed a March appointment but returned on May 11. (Tr. at 363.) Ms. Barbeau assessed chronic lower back pain; but Plaintiff had full range of movement without pain, normal muscle tone, intact strength and coordination, and stable gait. (*Id.*) Her mood was appropriate. (*Id.*) Plaintiff missed another appointment at the end of May. (Tr. at 362.) In July, her back still hurt,

she feared a new hernia had developed, she requested narcotics, and Ms. Barbeau diagnosed depression. (Tr. at 360.)

X-rays taken in July confirmed spondylosis at discs L3-L4 and T8-T9, Ms. Barbeau's notes state. (Tr. at 359.) She planned to refer Plaintiff to a neurosurgeon. (Tr. at 358-59.) Radiology imaging in July 2010 found "a 15 degree levorotoscoliosis of the lumbar spine, with compensatory dextroscoliosis of the thoracic spine." (Tr. at 379.) Additionally, the results showed moderate–but likely significant–"degenerative disc interspace narrowing" at the L3-4 disc, moderate degenerative spondylosis at the same disc, and modest degenerative spondylosis in the middle and lower thoracic spine. (Tr. at 379-80.)

Plaintiff called Ms. Barbeau's office on July 26, stating that the Vicodin "help[ed] best" and requesting an immediate refill. (Tr. at 358.) Below the telephone notes, the receptionist wrote that Plaintiff needed a drug screen and "drug contract" before receiving the prescription. (*Id.*) Plaintiff arrived later that day to sign the contract and complete the screening. (Tr. at 357.) During the September visit, the notes again indicate stable gait and intact coordination and strength; her diabetes was "unstable," however." (Tr. at 355.) Plaintiff also displayed a mass on her left clavicle. (Tr. at 355.) Scans and testing later found nothing concerning about this "palpable soft nonpainful lump." (Tr. at 377-78.)

Dr. Clifford Buchman conducted an orthopedic consultative examination on July 27. (Tr. at 394-99.) He focused on her back issues, but noted that she also complained about "recurrent abdominal hernias and diabetes" and made "vague" comments concerning "a history of carpal tunnel syndrome." (Tr. at 394.) The back pain had persisted for years, characterized by "numbness and weakness"; but Dr. Buchman thought the complaints were "vague." (*Id.*) Coughing, sneezing,

and lying down exacerbated the pain; hot showers provided "some relief . . . ." (*Id.*) Asked "what she is unable to do, she state[d] she has to do her activities." (*Id.*) Plaintiff explained that she worked as a home health provider, doing "housekeeping." (Tr. at 394, 396.) The report then grows somewhat confusing, whether through errors transcribing or Plaintiff's contradictory statements: "She is able to drive, do housework, watch TV, [and] get dressed. She states she needs assistance for showering and dressing; however, she recently helped one of her clients shower and dress by herself." (Tr. at 394.)

The physical examination was almost completely normal. (Tr. at 395, 398-99.) Plaintiff struggled when stooping and squatting, but the rest of the movements were satisfactory, including among others bending, pushing, pulling, carrying, sitting, standing, and climbing stairs. (*Id.*) Likewise, her reflexes were normal and she could walk on her heels and toes. (Tr. at 398-99.) Various special tests, such as Tinel's and Phalen's, were negative, and her straight-leg raising test was satisfactory. (Tr. at 395.) Dr. Buchman observed "evidence of scoliosis" in her lumbar spine and "right curvature of the thoracic spine." (*Id.*) He concluded, "[M]y opinion is that [Ms.] McClain can sit, stand or walk for eight hours per day. She is able to use her hands for fine or gross manipulation. She can interact with other people." (Tr. at 395-96.)

In August, Plaintiff had a consultative mental examination with Dr. Bruce Fowler. (Tr. at 388-92.) Plaintiff began the session describing her physical maladies: she had scoliosis, carpal tunnel syndrome, and tendinitis for years, as well as arthritis, hernias, fibromyalgia, and diabetes. (Tr. at 388.) Plaintiff claimed that her right carpal tunnel surgery was unhelpful. (Tr. at 389.) Her depression began after her father's death in 2000 and manifested in crying, lethargy, sadness, and fatigue. (*Id.*) She currently worked part-time helping with housekeeping for elderly lady, though

10

it was "not what she want[ed] to do." (Tr. at 388, 391.) She denied any past psychiatric hospitalizations or psychotherapy treatment. (Tr. at 389.) She dropped out of school after the ninth grade. (*Id.*) She lived alone, had a boyfriend, and talked to other friends, but did not feel close to any friends. (*Id.*) She clashed with her mother and got along "okay" with her siblings. (*Id.*) Her three children called, though she did not visit with them often. (*Id.*) Occasionally, she attended church. (*Id.*) A typical day included "cleaning," watching television, and "sitting around." (Tr. at 389-90.)

Dr. Fowler noted that Plaintiff drove to the interview, had normal posture and gait, and was attentive and cooperative. (Tr. at 390.) Her contact with reality was "good," her speech was spontaneous and organized, her mood was "fairly stable," and she was "mostly autonomous" in her daily activities. (*Id.*) She denied suicidal thoughts, though she had considered it in the past, "even cut[ting] her arm some years ago." (*Id.*) She doubted she would ever work "more than she is now." (*Id.*) A May 2010 Function Report filled out by Rebecca Zamora was in the file Dr. Fowler received. (Tr. at 391-92.) Her relationship to Plaintiff was left undefined in Dr. Fowler's notes, Ms. Zamora's report commented that Plaintiff needed help with personal care, struggled to perform basic physical functions, tired easily, and had cognitive difficulties. (Tr. at 392.)

Dr. Fowler diagnosed depression and concluded that Plaintiff had problems with her primary support group. (*Id.*) He assigned a Global Assessment of Functioning score of fifty-two, indicating "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of*

*Mental Disorders* 34 (4th ed., text rev. 2000).[2] He noted problems with her support group and finances. (*Id.*) Further, he believed psychotherapy would help her. (*Id.*) Nonetheless, she could "understand, retain and follow instructions of moderate complexity," and could complete tasks at work similar to those she currently did in her part-time job. (*Id.*) Intellectual deficits would not unduly limit "the kind of work she can do," he added. (*Id.*) Ending on a discordant note, he said that if her "statements about pain . . . are accurate," then together with her depressive symptoms they could "interfere with her ability to perform any job consistently right now." (*Id.*)

Plaintiff missed her first October appointment with Ms. Barbeau. (Tr. at 353.) The following week she returned, again complaining of lower back pain and again displaying normal gait and intact coordination and strength. (Tr. at 352.) The diabetes remained unstable. (*Id.*) In November, magnetic resonance image ("MRI") testing of her thoracic spine revealed normal alignment and T5-T6 "disc degeneration with left lateral disc osteophyte complex . . . causing mass effect on [the] left side of [the] spinal cord with left neural foramina stenosis." (Tr. at 375.) However, the MRI did not display spondylolisthesis, retrolisthesis, or spinal stenosis at other levels. (*Id.*) A lumbar spine MRI from the same date showed disc degeneration at three disc levels. (Tr. at 372.) Additionally, at L3-L4 also had "osteophyte complex and facet joint degeneration . . . with foramina stenosis and central spinal stenosis" affecting the L3 nerve root. (Tr. at 372.) The radiologist also diagnosed lumbar scoliosis. (Tr. at 373.) Further radiology tests a few days later confirmed the osteophyte and degenerative disc disease at L3-L4, and also diagnosed "[m]ild

---

[2] The most recent edition of this text, however, rejects the use of GAF scores. Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 16 (5th ed., 2013).

lumbar levoscoliosis. (Tr. at 371.) However, according to notes from Ms. Barbeau's office, a computed tomography ("CT") scan was normal. (Tr. at 351.)

Dr. E. Malcolm Field examined Plaintiff in January 2011, referring to her as Dr. Brenda Coughlin's patient. (Tr. at 385.) Explaining her condition, Plaintiff listed pain in her low back, hip, and thigh, and asserted "progressive difficulty with . . . walk[ing] any extended distance, significantly worse now than it was" even last summer. (*Id.*) Contrary to her report to Dr. Buchman, Plaintiff denied any history of numbness. (*Id.*) A few times too she had lost control of her bladder and bowels, and suffered perineal numbness. (*Id.*) "[S]ystemic review" of her major functions, including physical and psychiatric, did "not come up with any other definite findings." (*Id.*) In particular, her gait and reflexes were normal, spine abduction was satisfactory, the Romberg test examining neurological functioning was negative, she appeared "slim and trim," her arm strength and sensation was normal, no evidence suggested cervical cord compression, and made her feel like she was collapsing. (*Id.*) Diabetes likely played no role in "her overall situation," he opined. (Tr. at 386.) Concluding, he determined she had "very significant spinal stenosis at the L4-5 level" and would benefit from decompressive lumbar laminectomy. (*Id.*) Nonetheless her "medical problems" seemed "pretty well controlled." (*Id.*) Imaging tests Dr. Field ordered showed the spinal curvature and the osteophytic spur and degenerative narrowing at L3-L4; but the lumbar vertebrae had normal alignment, no compression fractures appeared, and despite Plaintiff's sensation of collapsing when bending backwards, no "abnormal motion" was seen when she leaned forward or backward. (Tr. at 387.)

Plaintiff saw Ms. Barbeau in March and early April, explaining that Dr. Field planned to operate on her back that month. (Tr. at 518-19.) During the April session, Plaintiff explained that

13

she lost her breath climbing flights of stairs. (Tr. at 519.) Her breathing appeared normal on examination, however, as did her gait. (*Id.*) She was cleared for surgery. (*Id.*)

Dr. Field and Dr. Waheed Akbar performed spinal fusion at L4-L5 on April 15, 2011. (Tr. at 322-25, 407-08, 421.) Plaintiff was examined prior to the surgery, again detailing her worsening back, thigh, and leg pain, exacerbated by walking. (Tr. at 326.) She denied experiencing "any particular episodes," such as "drop attacks or seizures." (*Id.*) Other problems she claimed included "some memory" issues, shortness of breath, and diarrhea. (Tr. at 327.) She denied depression, anxiety, and dysuria, among others. (*Id.*) Her reflexes and gait were normal during the examination, though she walked slowly and had difficulty with toe and heel walking. (*Id.*) Her spinal mobility was somewhat limited on all sides. (*Id.*) However, no other abnormalities appeared. (*Id.*) During the surgery, they isolated the disc needing decompression, noting that "[t]he other levels were seen to be completely stable and completely benign and no need for further fusion or intervention at those levels was seen to be present." (*Id.*) Dr. Field's operation report mentioned nerve root issues that might produce knee weakness. (Tr. at 325.)

She remained hospitalized until April 21. (Tr. at 406.) The surgery proceeded without a hitch, according to Dr. Field, but her "lack of getting up and moving along" significantly delayed her recuperation. (*Id.*) Two days after the surgery her symptoms seemed to recede, and her extremity strength was "good," but she remained torpid. (Tr. at 410.) Dr. Field informed her that she needed to move to recover. (*Id.*) Her lagging ambulation would likely fix itself as the soreness subsided, he wrote the next day. (Tr. at 411.) Additionally, he noted her "intact bladder and bowel control." (*Id.*) But her "slow start" continued four days out from the surgery; all vital signs and observable measures were satisfactory and, significantly, she had "intact reflexes, strength and

sensation in her lower extremities." (Tr. at 412.) Nonetheless, she rose to walk only half as often as Dr. Field requested, and he concluded she "need[ed] to be progressively active." (*Id.*) By the following day, Dr. Field began to surmise that Plaintiff's unacceptably minimal activity level resulted from a significant lack of motivation. (*Id.*) Requests that she move were met with promises that she would "do it tomorrow . . . ." (Tr. at 413.) Her strength and reflexes remained intact. (*Id.*) On the discharge date, Dr. Field's notes lament that despite the objective signs pointing to recovery Plaintiff "continue[d] to just really not do much. When asked rather pointedly if she planned on just staying in bed, she said she enjoyed it and really did not have very much planned." (Tr. at 414.) He wanted her to "begin a progressive walking and back exercise program," noting that her gait remained slow. (Tr. at 406.)

Two weeks later, Plaintiff returned to Dr. Field's office for a follow-up examination. (Tr. at 318, 404.) According nurse Nicole Felsing's report, Plaintiff declared she had "no significant low back pain" and felt "much better" after the operation. (*Id.*) She wore a corset brace and used a cane to walk; her gait was "slow but steady." (*Id.*) Her strength had stayed normal and the nurse felt she was "making good progress." (*Id.*) Aside from minor issues with the incision wound and left hip pain, Plaintiff's next examination two weeks later was similar. (Tr. at 403.) Ms. Barbeau's notes from a May examination mirror Dr. Field's: her breathing was normal, her gait was stable, her strength and coordination remained intact, and her mood was appropriate. (Tr. at 520.) Her diabetes was still unstable. (*Id.*)

Dr. Fowler conducted a second mental health consultative examination in May 2011. (Tr. at 312-17.) Large patches of the report match his first, often verbatim. Plaintiff claimed that her carpal tunnel syndrome persisted, even growing worse, preventing her from gripping objects. (Tr.

15

at 312.) Tendinitis flared in her elbows and arthritis beset her lower back, in addition to three hernias and fibromyalgia. (*Id.*) She could not pay her bills, which increased her depression. (*Id.*) Her last job, as a housekeeper for an elderly woman, ended in February 23, 2011 after the work became too physically demanding. (Tr. at 313.) Last month's surgery provided "no appreciable change or benefit." (*Id.*) Switching to her emotional symptoms, she felt depressed, lacking motivation and energy. (*Id.*) Plaintiff's relationship with her boyfriend had ended and she continued to live alone. (Tr. at 314.) Her relationships with her mother and siblings had not changed; she had not developed any close friendships over the last year. (*Id.*) A daughter helped her after surgery, but stopped after they argued. (*Id.*) Her daily activities remained the same. (*Id.*)

Dr. Fowler observed that Plaintiff drove herself to the interview, and that she used a cane and wore a brace on her wrist. (*Id.*) Her contact with reality again seemed satisfactory. (*Id.*) Despite noting that Plaintiff drove to the appointment, Dr. Fowler seemed to credit her statement that "she is not driving at all since her surgery" and used this lone piece of evidence to conclude that her "autonomy about everyday issues has diminished . . . ." (*Id.*) Her doubts that she could work were similar from the prior visit; this time, she thought she would never do any work again. (*Id.*) If she could work, however, she hoped to take jobs requiring social interaction. (Tr. at 316.) Like the first examination, her speech was spontaneous and organized. (Tr. at 314.) She again admitted that suicidal thoughts had occurred, but she never "made any true suicide attempts" and denied any risk of self-harm. (*Id.*) Anger and depression were evident during the interview, particularly about her children and bills; she cried explaining her exasperation. (Tr. at 315.)

Dr. Fowler again assessed depression, this time severe and assigned a GAF score of forty-nine, indicating serious symptoms. (Tr. at 316.) However, these were the only differences from the

first diagnosis: the other sections copy from the first and he even left the prognosis–"Fair"–unchanged. (Tr. at 316-17.) His explanation only slightly shifted. (Tr. at 317.) As a year ago, he thought she could "understand, retain, and follow directions of probably moderate complexity." (Tr. at 317, 392.) Due to her deepening depression and "ongoing physical problems," he now thought her "ability to perform routine and tangible tasks" had diminished, making it "difficult for her to perform any job on a consistent and reliable basis at this time." (Tr. at 317.)

Her recovery from the surgery continued in June, Dr. Akbar reported, when she demonstrated normal strength; x-rays confirmed satisfactory stability and healing. (Tr. at 420.) He noted that she walked for exercise and concluded she was adequately convalescing. (*Id.*) In July, Dr. Field wrote that Plaintiff had begun "to undergo satisfactory fusion." (Tr. at 402.) Her left leg troubled her, with pain radiating down her thigh; the examination was normal and the findings did not fit the complaint, leading Dr. Field to suspect the pain stemmed from inconsistent exercise efforts. (*Id.*) He ordered CT scans, which later showed the lumbosacral spine maintained normal height and alignment. (Tr. at 415, 512.) The lingering degenerative joint issues, with disc narrowing at L3-L4, was minimal. (*Id.*) The remaining findings raised no concerns, and the radiologist saw "no evidence of recurrence of the disc or any evidence for spinal canal narrowing or herniated disc." (Tr. at 415-16, 512-13.) That same month, she told Dr. Akbar the surgery had helped. (Tr. at 419.)

Ms. Barbeau's records from a July visit mention Plaintiff's noncompliance with treatments, her cane use, and that she displayed an appropriate mood. (Tr. at 522.) Plaintiff reported to Ms. Barbeau in August that her left knee had hurt for years and begun to swell occasionally. (Tr. at

521.) However, on examination, her left knee had a full range of motion and, again, her gait was stable and she maintained normal strength and coordination. (*Id.*) Plaintiff stated that after the surgery, Vicodin completely relieved her back pain. (*Id.*) Ms. Barbeau wrote that Plaintiff was noncompliant with recommended diabetes treatment. (*Id.*) During the post-operation visits, like many of the prior visits, she rated her pain at level five on a VA scale. (Tr. at 520-22.) An examination at the emergency room that month for an unrelated issue revealed normal neck range of motion, appropriate and cooperative mood, clear breathing, frequent urination without other urinary complaints, steady gait, and normal neurological results (Tr. at 433-35, 441-42, 444-45.) The report nowhere mentions current leg or back pain. (Tr. at 433-47.)

The left leg pain diminished to "tingling" by September, though she also said it felt worse than before the surgery. (Tr. at 417-18.) Her back caused no problems, however, and she was "walking well." (Tr. at 418.) The radiological testing showed healing, with some unspecified irregularities, Dr. Akbar reported, but "otherwise satisfactory." (*Id.*) Her healing remained "somewhat slow," and he advised her to continue walking for exercise. (*Id.*) In December, she informed Dr. Akbar that she was "doing better," and he wrote the same, noting her satisfactory gait–still with the cane and corset–and leg strength. (Tr. at 417.) The x-rays confirmed the fusion and demonstrated sufficient, if irregular and slow, healing. (*Id.*)

Records from Jane Street Health Center from late 2011 and into 2012 show that Plaintiff's neck was supple and her breathing clear. (Tr. at 452-53, 457, 463.) She continued to use a cane, but could "easily" transition "from lying to sitting to standing." (Tr. at 455.) She also claimed anxiety, and was offered a trial medication for it, although the examination found her judgment,

insight, mood, and affect were appropriate and she showed no depression, anxiety, or agitation. (Tr. at 457, 463, 467.)

In a February 2012 appointment with Ms. Barbeau, however, she reported neck pain, causing headaches and difficulty breathing, and claiming this had occurred over the past three to four months. (Tr. at 468.) The headaches registered at level five out of five and were constant, she claimed. (Tr. at 469.) The examination found some neck tension, but concluded it was supple and had full range of motion. (Tr. at 471.) Likewise, her breathing sounded clear. (*Id.*) The examination notes also state her judgment, insight, memory, and orientation were normal, adding that she lacked depression and anxiety. (*Id.*) Plaintiff also acknowledged that she had not used her diabetes medication for months and her diet was poor. (Tr. at 468.) Cervical spine imaging showed only mild to moderate "degenerative changes," most pronounced at C5-C6. (Tr. at 474.) When she returned later that month for an unrelated issue, the examination was normal: among other observations, the notes state she was not depressed or anxious, had no joint pain or muscle weakness, her neck was supple without rigidity, her breathing was unlabored and clear, her arms and legs had full range of motion and normal strength, and her judgment, insight, and mood were appropriate. (Tr. at 476-77.) Her diabetes was flagged as "uncontrolled" and "[d]eteriorated." (Tr. at 477.)

Plaintiff arrived at St. Mary's emergency room on March 18, 2012, complaining of back pain after an altercation with her boyfriend. (Tr. at 4530.) During the episode he had been seated in a car, and clutched Plaintiff, who remained outside, as the car began to move. (*Id.*) The pain was sharp, but not associated with any motor weakness. (Tr. at 478-79, 530-31.) She denied any past psychiatric history. (Tr. at 479, 531.) Her breathing was clear, her limbs were normal, and her

19

neurological examination was normal. (Tr. at 480, 532.) Her back was tender, but the CT scans "were negative for acute injury." (*Id.*) The physician thought that the altercation simply exacerbated her chronic back pain. (Tr. at 480, 533.) He recommended Vicodin and sent her home in stable condition. (*Id.*) CT scans found only mild thoracic scoliosis; "[m]ild generalized thoracic spondylosis without fracture, subluxation, or spinal stenosis; mild spinal canal narrowing at L3-L4 and L4-L5; and normal height and alignment in the lumbar spine. (Tr. at 482-84.) Visiting Ms. Barbeau at the Jane Street Center again in April, Plaintiff rated her back pain at level five out of five. (Tr. at 486.) Her breathing remained clear, she had no depression or anxiety, and she now walked without a cane. (Tr. at 487-88.) To treat the symptoms, they adjusted her prescriptions. (Tr. at 488.)

On April 18, Plaintiff attended physical therapy at St. Mary's. (Tr. at 491, 526.) During intake, she claimed that her lower back pain caused frequent trips to the emergency room. (*Id.*) The sharp, burning pain persisted at level nine out of ten, whether she rested or was active. (*Id.*) Her leg strength decreased as well. (*Id.*) Included in her medical history recitation, she noted various problems; among others, neck arthritis, past hernias, and her carpal tunnel surgery. (*Id.*) Prior treatment at the Jane Street Center was very helpful, she stated. (*Id.*) Her house had more than ten stairs. (*Id.*) Her cognitive functions were intact, with no deficits highlighted; she was alert and cooperative, had a good family support system, and lived with her daughter. (*Id.*) However, the notes also list anxiety, depression, and panic attacks. (*Id.*) Plaintiff asserted that she had difficulty turning over in bed, shopping, and exercising; it was relatively easier, but still not easy, to shave her legs. (Tr. at 528.) On a separate form Plaintiff completed, she ranked as "very difficult" nearly each of twenty-four separate tasks, such as climbing stairs, running, walking, crossing her legs,

putting on socks, getting out of bed, and carrying forty pounds. (Tr. at 494.) A few tasks were only "somewhat difficult" and two–sitting for four hours and moving a table–she was "unable to do." (*Id.*) The therapist ranked Plaintiff's lumbar strength extension at five out of five, and Plaintiff's lumbar functioning at three out of seven. (Tr. at 494, 524-25.) Additionally, she observed range of motion loss in spinal extensions. (Tr. at 524-25.) The prognosis was good, and the therapist believed Plaintiff could meet the goals they set.[3] (*Id.*)

### 2.    Medical Source Opinions from Consulting Reviewers

On May 12, 2011, Dr. Dale Blum, consulting for the state agency, completed a physical functional capacity report after reviewing Plaintiff's medical records. (Tr. at 164-66.) He determined that she could occasionally (up to one-third of the workday) lift or carry twenty pounds; frequently (two-thirds of the workday) lift or carry ten pounds; sit for six hours in an eight-hour workday; stand or walk for six hours during a workday; occasionally climb stairs and ladders, stoop, kneel, crouch, and crawl; and frequently kneel. (Tr. at 165.) Use of her hands was unlimited. (Tr. at 165-66.) Explaining his findings, Dr. Blum focused on Plaintiff's improvement after the recent spinal fusion and the relatively robust functioning determined by the July 2010 consultative examination. (Tr. at 166.)

---

[3] The ALJ did not consider many of the reports in the current record, which Plaintiff submitted for the first time to the Appeals Council. (Tr. at 5-53, 61-104.) In this Circuit, where the Appeals Council considers additional evidence but denies a request to review the ALJ's decision, since it has been held that the record is closed at the administrative law judge level, those "AC" exhibits submitted to the Appeals Council are not part of the record for purposes of judicial review. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996); *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993). Therefore, since district court review of the administrative record is limited to the ALJ's decision, which is the final decision of the Commissioner, the court can consider only that evidence presented to the ALJ. In other words, Appeals Council evidence may not be considered for the purpose of substantial evidence review.

The following month, Dr. Bruce Douglass, a consulting psychologist, reviewed Plaintiff's records and submitted a mental functional capacity report. (Tr. at 166-68.) She was not significantly limited in the following: remembering procedures; understanding simple instructions; carrying out those instructions; sustaining "an ordinary routine without special supervision"; making simple decisions at work; relating to coworkers without distracting them; and appropriate comportment and cleanliness. (Tr. at 167-68.) Moderate limitations existed in understanding detailed instructions; carrying out those instructions; concentrating for extended periods; maintaining a punctual and consistent schedule; working with others without distraction; dealing with the general public; accepting supervisory criticism. (*Id.*) In short, she could "perform routine, 2-step tasks on a sustained basis." (Tr. at 168.) Evidence of her daily activities did not suggest greater limitations. (*Id.*)

### 3.    Application Reports and Administrative Hearing

Plaintiff listed three past positions in her Work History Report. (Tr. at 259-62.) All were essentially housekeeping positions, involving cleaning, cooking, mopping, and washing. (*Id.*) She worked from 2000 until 2001, again in 2007 for an unknown period, and finally from 2010 until February 23, 2011. (*Id.*) During every period, she estimated that she walked, stood, stooped, kneeled, crouched, and grasped large objects each for one-and-a-half hours a day. (Tr. at 260-63.) It also appears that she could write, type, and handle small objects.[4] (*Id.*) Additionally, she never lifted anything over ten pounds or supervised others. (*Id.*) She worked for seven-and-a-half hours

---

[4] In the blank space next to the line asking how long she could "[w]rite, type or handle small objects," she wrote "can good" for the first two positions, (Tr. at 260-61), and "foods" for the third. (Tr. at 262.)

per week during these positions. (Tr. at 236, 252.) Another form lists full-time work in manufacturing in 1996. (Tr. at 252.)

On February 19, 2011, Plaintiff filled out a Function Report. (Tr. at 267-74.) Plaintiff's daughter also filled out a similar form, largely mirroring her mother's conclusions. (Tr. at 275-82.) Plaintiff explained that her condition had deteriorated, limiting her ability to spend time with her grandchildren. (Tr. at 267.) She spent the typical day watching television; her daughter would cook for her since she could not stand long enough to finish preparing meals. (Tr. at 268.) Her job caring for her friend was ending soon due to her back pain. (*Id.*) Sometimes her grandson stayed with her to help. (*Id.*) Personal care was difficult, for instance her daughter shaved Plaintiff's legs since she could not bend over. (*Id.*) Her daughter also took care of indoor chores, such as cleaning and laundry, while her grandson completed outdoor work. (Tr. at 269.) However, she indicated she cleaned at times, stating it took her at least four hours. (*Id.*) She could ride in a car, but pain prevented her from driving. (Tr. at 270.) Monthly shopping trips took a long time to complete. (*Id.*) Handling finances did not present a problem. (*Id.*) She spent time with her family, though she never attended regular social events. (Tr. at 271.) Her relationship with her mother was poor. (Tr. at 272.)

Nearly every physical and mental function that could be limited by impairments were limited, she claimed. (Tr. at 272.) She estimated she could walk two blocks before resting for thirty minutes and maintain concentration for thirty minutes. (*Id.*) Following written and spoken instructions was difficult. (*Id.*) She used a brace on both hands, she claimed, beginning when it was prescribed in 2001. (Tr. at 273.) Stress, anger, and resistance to change characterized her emotional state. (Tr. at 273.)

At the administrative hearing on May 17, 2012, Plaintiff began by describing her back pain. (Tr. at 132-33.) It constantly remained at pain level ten out of ten, yet certain actions such as walking and standing further aggravated the pain. (Tr. at 133.) Plaintiff denied having any trouble taking care of her personal needs; light housework, however, caused back pain and required frequent breaks. (Tr. at 133-34.) Outdoor work was also beyond her abilities, so nephews took care of her yard. (Tr. at 134.) Leaving the house for recreation was rare; occasionally she dined at restaurants with her daughter, her back inevitably aching and stiffening. (*Id.*) Three or four hours of uninterrupted sleep was all she could cobble together before pain woke her. (Tr. at 135.) Standing, walking, and sitting also brought on pain. (*Id.*) Two blocks was her maximum walking distance and "[l]ess than 20 pounds" was the most she could lift and carry. (Tr. at 136.) Squatting threw off her balance, she knew, because attempts to perform squatting exercises caused her to fall. (*Id.*) Manipulating objects was tricky, as carpal tunnel numbed her hands at times. (Tr. at 136-37.)

Scoliosis and diabetes also afflicted her. (Tr. at 137.) The latter affected her if she failed to take insulin, leading to shaking spells; "that's the only thing," she summed up when asked the impact of her diabetes. (*Id.*) "And do you suffer from any . . . mental problems?" her attorney inquired. (*Id.*) "No, no," Plaintiff replied. (*Id.*) Finally, frequent urination led to frequent bathroom breaks–about every fifteen minutes–preventing her from "going places . . . ." (Tr. at 137-38.)

The ALJ then asked about her work in 2011, mentioning the records showing her position with the Department of Community Health, which arranged her part-time housekeeping job. (Tr. at 138, 388.) "No," she responded, she had not worked since October 3, 2009. (Tr. at 138.) Presented again with the record, she continued denying any employment since 2009. (Tr. at 138-39.) Transitioning to her daily life, she testified she rented a house and was "able to keep up with

24

the household work," as the ALJ put it. (Tr. at 139.) She sometimes cooked for herself, her daughter did her grocery shopping, she regularly visited but never babysat her three grandchildren, and she did not drive, rather her daughter brought her where she needed to go. (Tr. at 139-40.) Her evaluation in April 2012 was her only physical therapy session because funding for more had not yet been approved. (Tr. at 141-42.) Finally, she denied that her medications produced any side effects. (*Id.*)

> The ALJ then asked the vocational expert ("VE") to
>
> assume . . . a hypothetical [with] individual the same age, education, and work experience as the Claimant. Further assume this person can perform work at the light exertional level. She can never climb ladders, ropes, or scaffolds, and can never crawl. She can occasionally climb ramps or stairs, occasionally balance, stoop, kneel, or crouch. She must avoid concentrated exposure to extreme cold, wetness, and vibration, and avoid all exposure to workplace hazards.
>
> She can perform simple, routine, repetitive task[s], and can withstand occasional changes in a routine work setting. She has no past work.

(Tr. at 143-44.) Do any jobs fit that person's limitations? the ALJ asked. (Tr. at 144.) "Yes," the VE replied, that individual could work in multiple unskilled, light positions, including machine tender (7800 positions in Michigan); light assembler (14,000 positions); and line attendant (4800 positions). (*Id.*) Lowering the exertional level down to sedentary left various jobs available: bench assembler (4900 positions in Michigan); parts checker (3500 positions); and machine attendant (4000 positions). (*Id.*) However, neither of those two hypothetical workers were employable if they missed at least two days of work per month or were "off-task" over ten or fifteen percent of the time. (Tr. at 144-45.)

### F.    Analysis and Conclusions

### 1.    Legal Standards

25

The ALJ determined that since the prior ALJ decision, Plaintiff had new limitations. (Tr. at 115-22.) She had the RFC to perform a limited range of light work:

> The claimant can occasionally balance, stoop, kneel, crouch, and climb ramps [and] stairs, but she can never crawl or climb ladders, ropes, or scaffolds. The claimant must avoid all exposures to workplace hazards. The claimant can perform simple, routine, repetitive tasks. Additionally, the claimant can withstand occasional changes in a routine work setting.

(Tr. at 115.) Light work

> involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. §§ 404.1567(b), 416.967(b).

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

### 2.    Substantial Evidence

If the Commissioner's decision applied the correct legal standards and is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence could justify the opposite conclusion. 42 U.S.C. § 405(g); *McClanahan*, 474 F.3d at 833; *Mullen*, 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

26

Plaintiff asserts that the ALJ's credibility assessment erred, leading him to form an inaccurate hypothetical for the VE. (Doc. 10 at 6.) Because the hypothetical matched the RFC, the argument essentially disputes that substantial evidence supports the RFC. (*Id.*) Plaintiff discusses relevant law then recounts her testimony. (*Id.* at 7-10.) She then lists some of the objective evidence, concluding that her contentions at the hearing "are backed up by medical documentation . . . ." (*Id.* at 11-12.) This constitutes the core, indeed the only, argument she levies. The final few pages canvass regulations and cases about medical sources without ever linking this law to the present case.

Defendant thinks Plaintiff's argument is so scattered and muddled that any claim buried in it lies undeveloped, thus waived. (Doc. 14 at 15-19.) The Sixth Circuit has explained waiver in this context: "This court has consistently held that . . . arguments adverted to in only a perfunctory manner, are waived." *Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 624 (6th Cir. 2013). *See also Aarti Hospitality*, *L.L.C. v. City of Grove City, Ohio*, 350 F. App'x 1, 11 (6th Cir. 2009) ("After setting forth the applicable law on their due process claim, plaintiffs devote one sentence in their appellate brief to 'arguing' why the district court's judgment should be reversed . . . . Accordingly, we deem plaintiffs' appeal of their due process claim forfeited."); *Fielder v. Comm'r of Soc. Sec.*, No. 13-10325, 2014 WL 1207865, at *2 (E.D. Mich. Mar. 24, 2014) (holding that claim on appeal from ALJ's decision was waived because plaintiff referred to it in a perfunctory manner); *Preston v. Comm'r of Soc. Sec.*, No. 12-13327, 2013 WL 4550512, at *7 (E.D. Mich. Aug. 28, 2013) (finding waiver where "Plaintiff failed to identify a specific medical opinion the ALJ erred in evaluation") (adopting Report & Recommendation); *Perry ex rel. King v. Comm'r Soc. Sec.*, No. 12-cv-14439, 2013 WL 3328523, at *7 (E.D. Mich. July 2, 2013) ("Plaintiff cites to case law that ALJs must

27

provide good reasons for discounting the opinions of the claimant's treating physicians, but she has not identified any treating physician opinion that she believes the ALJ overlooked or improperly weighed.") (adopting Report & Recommendation).

The threat of waiver has stalked Plaintiff's counsel through many cases. *See, e.g.*, *Sadler v. Comm'r of Soc. Sec.*, No. 13-13552, 2014 WL 4724767, at *6 (E.D. Mich. Sept. 23, 2014) (noting counsel "has developed a reputation in this District for submitting briefs on behalf of social security claimants that are thoroughly deficient and devoid of proper factual substance and legal analysis"); *Fielder v. Comm'r of Soc. Sec.*, No. 13-10325, 2014 WL 1207865, at *1 n.1 (E.D. Mich. Mar. 24, 2014) (same). While the present brief may lack nuance and polish, it develops a claim: it presents law on credibility evaluations, lists the testimony Plaintiff wishes the ALJ had found credible, and cites supporting objective evidence. (Doc. 10 at 10-12.) The gossamer threads connecting these areas–the law, her subjective complaints, and the other evidence–are largely left unmentioned, but the brief stitches enough together to pass the waiver test. However, the only claim before the court attacks the credibility findings and their skewing of the RFC; the patchwork citations to medical source law, (*id.* at 12-15), do not present an argument.

### a.      Res Judicata

In the Sixth Circuit, a prior decision by the Commissioner can preclude relitigation in subsequent cases:

> When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding.

AR 98-4(6), 1998 WL 283902, at *3 (acquiescing to *Drummond v. Commissioner*, 126 F.3d 837 (6th Cir. 1997)). The regulations also explicitly invoke *res judicata*: An ALJ can dismiss a hearing request where "res judicata applies in that we have made a previous [final] determination or decision under this subpart about your rights." 20 C.F.R. §§ 404.957, 416.1457. Collateral estoppel is the branch of *res judicata* applied in this context. As the Third Circuit explained, *res judicata* formally "consists of two preclusion concepts: issue preclusion and claim preclusion." *Purter v. Heckler*, 771 F.2d 682, 689 n.5 (3d 1985); *see also Groves v. Apfel*, 148 F.3d 809, 810 (7th Cir. 1998) (Posner, J.) (discussing the "collateral estoppel branch of *res judicata*" in Social Security cases). Claim preclusion prevents renewing a judgment on the same cause of action; issue preclusion, or collateral estoppel is less expansive, "foreclosing relitigation on all matters that were actually and necessarily determined in a prior suit." *Id.*

The *res judicata* effect of past ALJ decisions is actually a form of collateral estoppel precluding reconsideration of discrete factual findings and issues. *See Brewster v. Barnhart*, 145 F. App'x 542, 546 (6th Cir. 2005) ("This Court will apply collateral estoppel to preclude reconsideration by a subsequent ALJ of factual findings that have already been decided by a prior ALJ when there are no changed circumstances requiring review.").[5] The Commissioner's internal guide explains the different issues and factual findings precluded by *res judicata* under *Drummond*. Soc. Sec. Admin., *Hearings, Appeals, and Litigation Law Manual*, § I-5-4-62, 1999

---

[5] The Sixth Circuit has not decided "whether a party asserting collateral estoppel in a Social Security case . . . must establish the traditional elements of collateral estoppel." *Brewster*, 145 F. App'x at 547. *See also Caudill v. Comm'r of Soc. Sec.*, 424 F. App'x 510, 514-15 (6th Cir. 2011) (suggesting that the elements do not apply); *id.* at 519-21 (White, J., dissenting in part) (noting that Sixth Circuit unpublished decisions and other authority "strongly suggest that traditional rules of collateral estoppel should apply to the decisions of ALJs in social security disability cases"); *Rogers v. Comm'r of Soc. Sec.*, 225 F.3d 659, 2000 WL 799332, at *4 (6th Cir. 2000) (applying one of the elements in a Social Security case).

WL 33615029, at *8-9 (Dec. 30, 1999) (hereinafter "*Hallex*"). These include the RFC and various other findings along the sequential evaluation process, such as "whether a claimant's work activity constitutes substantial gainful activity," or whether she meets or equals a listing. *Id.*

Evidence of "changed circumstances" after the prior decision allows the ALJ to make new findings concerning the unadjudicated period without disturbing the earlier decision. *See Bailey ex rel. Bailey v. Astrue*, No. 10-262, 2011 WL 4478943, at *3 (E.D. Ky. Sept. 26, 2011) (citing *Drummond*, 126 F.3d at 842-43). In other words, even though the first ALJ did not make any findings concerning later periods, her decision still applies to those periods absent the requisite proof. Thus, as applied in this Circuit, the AR 98-4(6) and *Drummond* essentially create a presumption that the facts found in a prior ruling remain true in a subsequent unadjudicated period unless "there is new and material evidence" on the finding. *See Makinson v. Colvin*, No. 5:12CV2643, 2013 WL 4012773, at *5 (N.D. Ohio Aug. 6, 2013) (adopting Report & Recommendation) ("[U]nder *Drummond* and AR 98-4(6), a change in the period of disability alleged does not preclude the application of *res judicata*.") (citing *Click v. Comm'r of Soc. Sec.*, No. 07-13521, 2009 WL 136890, at *4 (E.D. Mich. Jan. 16, 2009))); *cf. Randolph v. Astrue*, 291 F. App'x 979, 981 (11th Cir. 2008) (characterizing the Sixth Circuit's rule as creating a presumption); *Chavez v. Bowen*, 844 F.2d 691, 693 (9th Cir. 1988) ("The claimant, in order to overcome the presumption of continuing nondisability arising from the first administrative law judge's findings of nondisability, must prove 'changed circumstances' indicating a greater disability." (quoting *Taylor v. Heckler*, 765 F.2d 872, 875 (9th Cir. 1985))).

In *Drummond*, for example, the court held that the first ALJ's RFC applied to a subsequent period unless the circumstances had changed. 126 F.3d at 838-39, 843. *See also Priest v. Soc. Sec.*

*Admin.*, 3 F. App'x 275, 276 (6th Cir. 2001) (noting that in order to win benefits for a period after a previous denial, the claimant "must demonstrate that her condition has so worsened in comparison to her condition [as of the previous denial] that she was unable to perform substantial gainful activity"); *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1232-33 (6th Cir. 1993) (same). The Sixth Circuit made this clear in *Haun v. Commissioner of Social Security*, rejecting the argument that *Drummond* allowed a second ALJ to examine de novo the unadjudicated period following the first denial. 107 F. App'x 462, 464 (6th Cir. 2004).

To overcome the presumption that the claimant remains able to work in a subsequent period, the claimant must proffer new and material evidence that her health declined. The Sixth Circuit has consistently anchored the analysis on the comparison between "circumstances existing at the time of the prior decision and circumstances existing at the time of the review . . . ." *Kennedy v. Astrue*, 247 F. App'x 761, 768 (6th Cir. 2007). In a case predating *Drummond*, the court explained,"[W]hen a plaintiff previously has been adjudicated not disabled, she must show that her condition so worsened in comparison to her earlier condition that she was unable to perform substantial gainful activity." *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1232-33 (6th Cir. 1993). Later, it reiterated, "In order to be awarded benefits for her condition since [the previous denial], Priest must demonstrate that her condition has . . . worsened in comparison to her [previous] condition . . . ." *Priest*, 3 F. App'x at 276. The ALJ must scan the medical evidence "with an eye toward finding some change from the previous ALJ decision . . . ." *Blackburn v. Comm'r of Soc. Sec.*, No. 4:11-cv-58, 2012 WL 6764068, at *5 (E.D. Tenn. Nov. 14, 2012), *Report & Recommendation adopted by* 2013 WL 53980, at *1 (E.D. Tenn. Jan. 2, 2013). That is, the evidence must not only be new and material, but also must show deterioration. *Drogowski v.*

*Comm'r of Soc. Sec.*, No. 10-12080, 2011 WL 4502988, at *8 (E.D. Mich. July 12, 2011), *Report & Recommendation adopted by* 2011 WL 4502955, at *4 (E.D. Mich. Sept. 28, 2011). In *Drogowski*, for example, the court rejected the plaintiff's argument that a report met this test simply because it was not before the first ALJ. *Id.* at *2, 8-9. These decisions make clear that the relevant change in circumstances is not a change in the availability of evidence, but a change in Plaintiff's condition.

### b.    Plaintiff's Credibility and the RFC

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B); *accord* 20 C.F.R. § 404.1520(a)(3); *Wyatt*, 974 F.2d at 683. When a disability determination that would be fully favorable to a claimant cannot be made solely on the basis of the objective medical evidence, an ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, No. 09-5773, 2011 WL 180789, at *4 (6th Cir. Jan. 19, 2011) (citing *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)); *Warner*, 375 F.3d at 390. However, "[i]f an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so." *Felisky*, 35 F.3d at 1036.

The social security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the

underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at \*2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994); *Felisky*, 35 F.3d at 1038-39; *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at \*2.

While "'objective evidence of the pain itself'" is not required, *Duncan*, 801 F.2d at 853 (quoting *Green v. Schweicker*, 749 F.2d 1066, 1071 (3d Cir. 1984)), a claimant's description of his physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at \*1. Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(i)     [D]aily activities;

(ii)    The location, duration, frequency, and intensity of . . . pain;

(iii)   Precipitating and aggravating factors;

(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)     Treatment, other than medication, . . . received for relief of . . . pain;

(vi)    Any measures . . . used to relieve . . . pain.

20 C.F.R. § 404.1529(c)(3). *See also Felisky*, 35 F.3d at 1039-40; SSR 96-7p, 1996 WL 374186, at *3. Furthermore, the claimant's work history and the consistency of her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers*, 486 F.3d at 247. *See also Cruse*, 502 F.3d at 542 (noting that the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'" (quoting *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence."))); *Jones*, 336 F.3d at 475 ("[A]n ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely on an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless [she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A). *See also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most [she] can still do despite [her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). The Plaintiff bears the burden of proof during the first four stages of analysis, including proving her RFC. *Jones*, 336 F.3d at 474; *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999). At step five, the Commissioner does not have add anything to

the RFC, 20 C.F.R. § 404.1560(c), and consequently the burden to prove limitations remains with the Plaintiff at this stage. *Roby v. Comm'r of Soc. Sec.*, 48 F. App'x 532, 538 (6th Cir. 2002); *DeVoll v. Comm'r of Soc. Sec.*, 234 F.3d 1267, 2000 WL 1529803, at *3 (6th Cir. 2000) (unpublished table decision); *Her*, 203 F.3d at 391-92. The hypothetical is valid if it includes all credible limitations developed prior to step five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Mich. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 2009).

### c.    Analysis

Plaintiff's brief fails to address the threshold *res judicata* issue. The ALJ could veer from the prior decision only to the extent new and material evidence demonstrated that Plaintiff's condition deteriorated after that previous decision. *See Drummond*, 126 F.3d at 842; AR 98-4(6), 1998 WL 283902, at *3. While credibility findings do not bind subsequent decision-makers, *Hallex*, § I-5-4-62, 1999 WL 33615029, at *9, the analysis nonetheless is refracted through the *res judicata* standard; in other words, ALJs must determine the credibility of plaintiffs' subjective complaints that their condition worsened. Here, the ALJ properly, indeed thoroughly, addressed Plaintiff's credibility. I therefore recommend rejecting Plaintiff's argument.[6]

---

[6] One oddity in the ALJ's decision is the scope of her review. The ALJ acknowledged that *res judicata* precluded reconsideration without new evidence. (Tr. at 122.) She found such evidence in the record, asserting it "pertain[ed] to the current period of adjudication . . . ." (*Id.*) However, the "current period of adjudication," if the same as Plaintiff's claimed disability period, overlaps with the prior claim. Her 2003 application asserted she became disabled in 1999 and the first ALJ issued his decision in September 2006. (Tr. at 150, 153, 159.) The current claim dates her disability onset as June 1, 2002. (Tr. at 218.) Thus, she presently claims disability for a previously adjudicated period.

The ALJ's statement in the decision suggests that as long as the claimant presents new and material evidence, the second ALJ can reconsider the findings related specifically to the adjudicated period. This appears mistaken. Under both *Drummond* and AR 98-4(6), *res judicata* does not apply to the *unadjudicated period* if new and material evidence shows that the claimant's condition deteriorated during that period. *Drummond*, 126 F.3d at 842; AR 98-4(6), 1998 WL 283902, at *3. The adjudicated period remains decided and cannot be reconsidered

Inconsistencies riddle the record. Most are minor, others more serious. None seem conscious efforts to dissemble, but combined they lend considerable support to the ALJ's findings. The ALJ highlighted and discussed the most glaring mistakes. (Tr. at 119-20.) Plaintiff's statements concerning her ability to manage personal care clash. (*Id.*) The Function Reports she and her daughter completed prior to the hearing asserted she struggled in this area. (Tr. at 268, 276.) An example Plaintiff produced was that because she could not bend, her daughter shaved Plaintiff's legs. (Tr. at 268.) Yet, at the hearing Plaintiff denied needing help with her personal needs. (Tr. at 133-34.) The month before the hearing, she suggested to the physical therapist that she could shave her legs, despite difficulties. (Tr. at 528.) Similarly, and perhaps even more befuddling, Plaintiff told Dr. Buchanan she required help showering and dressing, but also that she

---

under the new evidence test laid out in *Drummond* and AR 98-4(6). Even the Commissioner's narrower version of *res judicata*, applied in other circuits, does not indicate that subsequent ALJs can peel back the first decision merely because of new evidence. AR 98-4(6), 1998 WL 283902, at *2-3. Instead, the regulations provide different mechanisms for undoing the first decision, called reopening. 20 C.F.R. §§ 404.987, 404.992, 416.1487, 416.1492. Courts characterize these as separate exceptions to *res judicata*. *See Purter*, 771 F.2d at 693 (characterizing the regulations as "equitable exceptions to administrative *res judicata*"); *Hunt v. Weinberger*, 527 F.2d 544, 548 (6th Cir. 1975) (noting these "regulations provide for a relaxation of the res judicata doctrine").

Thus, the proper view is that arguments against prior decisions should channel through these regulations, not the analysis laid out in *Drummond* that specifically applies to periods after the prior decision. In *Hawley v. Commissioner of Social Security*, the plaintiff's first claim was denied in 1999. No. 01-74196, 2003 WL 1120159, at *2 (E.D. Mich. Feb. 3, 2003). During his second case, he offered evidence that he had been unable to work since 1996, a period the first decision covered. *Id.* The court noted that the evidence was "irrelevant" because it did not indicate deterioration after 1999. *Id.* at *3. It noted, however, that the plaintiff could seek reopening based on that evidence. *Id.*

Here, Plaintiff did not request a reopening and the ALJ did not seem to intend it. Reopenings can occur constructively, *Gay v. Comm'r of Soc. Sec.*, 520 F. App'x 354, 358 (6th Cir. 2013), but the regulatory factors still apply. Chief among these is the two year (SSI) and four year (DBI) time limits for good cause reopenings. 20 C.F.R. §§ 404.988, 416.1488. Consequently, an ALJ is powerless to reopen a claim outside these periods and constructive reopenings of claims beyond them are barred. *See Glazer v. Comm'r of Soc. Sec.*, 92 F. App'x 312, 315 (6th Cir. 2004) ("The concept of constructive reopening cannot extend beyond the scope of authority granted under the regulations. Because more than four years had passed since the denial of the original application, the Commissioner could not have constructively reopened Glazer's case." (citations omitted)); *King v. Chater*, 90 F.3d 323, 325 (8th Cir. 1996) (same). The ALJ's decision here likely came too late to reopen. In any case, the error, if any, benefitted Plaintiff and does not provide a ground for reversal.

could, at work, assist others who needed such help. (Tr. at 394.) There was also evidence that Plaintiff could use stairs, (Tr. at 398, 519, 526 ), though she claimed this proved "very difficult." (Tr. at 494.)

Other contradictions abound. Statements in the Function Reports clashed with testimony about her ability to cook and keep house: the reports state she struggled at or could not complete these tasks; the hearing testimony stated she could do them. (Tr. at 119-20, 139-40, 267-69, 277.) In her Work History Report, she stated that the housekeeping position she held during the disability period required her to mop, cook, clean, and wash. (Tr. at 259-62.) Contradictory statements about her ability to drive also appear in the record. (Tr. at 120.) The most prominent contradiction comes from consultative examination notes. She admitted to Dr. Buchman that she could drive, (Tr. at 394); she drove to both examinations with Dr. Fowler, but at the second, claimed she had stopped "driving at all . . . ." (Tr. at 314, 390.) The ALJ also appropriately flagged her hearing testimony that she last worked in 2009, which was flatly contradicted by substantial evidence: her self-reported Work History form, (Tr. at 259), and her statements to Dr. Fowler, (Tr. at 313). (Tr. at 119.) These discrepancies support the ALJ's credibility analysis.

The ALJ looked to other evidence as well. He noted that Plaintiff's work during the disability period, though not disqualifying, indicated "that the claimant's daily activities have been somewhat greater than she has generally reported." (Tr. at 120.) Post-onset work is a valid consideration. *See, e.g.*, *Brewer v. Sec'y of Health & Human Servs.*, 866 F.2d 431, 1989 WL 4167, at *3 (6th Cir. 1989) (unpublished decision) (noting that substantial evidence supported denial of benefits because, in part, the claimant sought work after the onset date). The ALJ also cited Plaintiff's considerable history of noncompliance. (Tr. at 120.) Ms. Barbeau raised the issue

multiple times in her notes, (Tr. at 521-22), Plaintiff missed appointments with Ms. Barbeau, (Tr. at 353, 362-63), and Dr. Field's post-operation notes provide a first-hand account of her recalcitrance. (Tr. at 406-14.)

Objective medical evidence further bolsters the ALJ's analysis. Examinations both before and after the April 2011 surgery consistently observed that she had steady gait, intact strength and coordination, and full range of motion in her neck and extremities. (Tr. at 318, 327, 352, 363, 385-87, 395, 398-99, 402, 404, 411, 420, 433-35, 441-42, 444-45, 452-53, 457, 463, 471, 478-79, 520, 521, 530-31.) And as the ALJ observed, despite using a cane after the surgery, "the record does not suggest she was given a prescription to use a cane . . . ." (Tr. at 118.) In fact, in the examination just before her surgery, she displayed normal, if slow, gait. (Tr. at 327.) Moreover, the ALJ discussed evidence her condition had improved after the surgery. (Tr. at 117-18.) Even as she recuperated in the hospital, declining requests that she start moving, she had intact strength and reflexes. (Tr. at 411, 413.) Within weeks she declared she had felt substantially better, with "no significant low back pain." (Tr. at 318, 404.) The recovery progressed in the months that followed, according to one of the surgeons who examined her after the operation, (Tr. at 420), and she continued to state the surgery had helped. (Tr. at 419.)

When she later began to complain of recurrent pains, she still appeared to walk normally and maintain satisfactory leg strength. (Tr. at 417-18.) One of the last reports in the record notes she was not using a cane. (Tr. at 487-88.) Other recent reports from Jane Street Center indicated she could "easily" move from "lying to sitting to standing." (Tr. at 455.) The final set of notes found her lumbar strength was normal, despite some functional deficiencies. (Tr. at 494, 524-25.) Plaintiff stated on numerous occasions that medications and other treatments helped ease the pain,

again both before and after the surgery, even stating that Vicodin completely relieved the pain during the latter period. (Tr. at 358, 491, 521, 526.) Moreover, post-operation imaging tests and x-rays did not uncover proof that her back had substantial impairments. (Tr. at 415-17, 474, 480, 512-13, 532.) The latest tests from the emergency room following her March 2012 incident did not show any injuries to her back and characterized the degenerative issues as "[m]ild." (Tr. at 480, 482-84, 532.)

The ALJ sufficiently considered the opinion evidence concerning her physical capacities, properly finding it supported his decision to discount her credibility. (Tr. at 120-22.) Dr. Blum's functional capacity opinion largely matched the ALJ's findings. (Tr. at 120, 164-66.) Specifically, the ALJ explained it was consistent with Plaintiff's post-surgery improvement and daily activities. (Tr. at 120.) For the same reasons, and because he examined Plaintiff, the ALJ also gave "significant weight" to Dr. Buchman's report. (Tr. at 121, 394-99.) The thorough examination described in that report discovered nearly completely normal findings. (Tr. at 395, 398-99.) Though the other sources who actually treated Plaintiff did not submit opinion statements, their findings as discussed above repeatedly indicated her physical abilities exceeded her contentions. For example, when Plaintiff visited Ms. Barbeau in July 2011 complaining of knee pain, the examination found she had a full range of motion in that knee, her gait remained stable, and she had normal strength. (Tr. at 521-22.) Thus, no source opined any physical limitations that would preclude work.

Aside from degenerative back disorder, Plaintiff's diabetes was the only other physical issue raised with any consistency in the record. (Tr. at 352, 355, 477, 520.) The ALJ acknowledged that Plaintiff suffered from diabetes but adequately explained why she did not find it disabling. (Tr. at

118-19.) Specifically, she noted that despite warnings she needed to adjust her treatment, (Tr. at 449), Plaintiff waited months before seeking treatment. (Tr. at 119.) Later, she admitted she had not used her diabetes medication in months and did not eat appropriately. (Tr. at 119, 468.) Nonetheless, during that session she had intact sensation. (Tr. at 119, 471.) The ALJ also pointed out that Plaintiff used numerous medications for diabetes, (Tr. at 311), without adverse side effects, (Tr. at 141-42). (Tr. at 119.) Finally, Dr. Field did not believe diabetes affected her "overall situation." (Tr. at 386.) Plaintiff does not craft any argument in her brief concerning diabetes; thus I suggest the ALJ's analysis sufficiently explained her decision.

Plaintiff does not attack the ALJ's step two analysis, which found that her carpal tunnel syndrome, fibromyalgia, and frequent urination were not severe. (Tr. at 113.) However, Plaintiff cites one report where she told an examiner she had hernia repairs in 2005 and 2007, and carpal tunnel surgery in 2004. (Doc. 10 at 12) (intending to cite (Tr. at 449).) As an initial matter, this cursory reference does not develop any argument. She makes no other mention of these issues and nowhere discusses why they pass the severity threshold. The only mention of hernias occurring during the relevant period–after the first ALJ's decision–is Plaintiff's brief remark to Ms. Barbeau that she thought a new hernia might have developed. (Tr. at 360.) In fact, her physical therapy intake form, completed in April 2012, listed only two hernias in her medical history. (Tr. at 491.)

Evidence of carpal tunnel similarly is lacking. She asserted it still plagued her, (Tr. at 136-37, 312), but did little else; the record does not demonstrate any treatment for it, and only one person observed she wore a wrist brace on one wrist. (Tr. at 314.) The only medical evidence implicating this impairment, Dr. Buchman's report, showed she could pick up coins and pencils, write, and make fists. (Tr. at 398.) The ALJ also noted that Dr. Buchman's other testing indicated

she did not suffer from carpal tunnel. (Tr. at 113.) Her own reports indicated she could write, type, and handle small objects. (Tr. at 260-63.) Further, two of the surgeries took place prior to the first ALJ decision; thus they reside in the adjudicated period and are largely "irrelevant" to whether she deteriorated after 2006. *See* No. *Hawley v. Comm'r of Soc. Sec.*, 01-74196, 2003 WL 1120159, at *3 (E.D. Mich. Feb. 3, 2003) (characterizing similar evidence as "irrelevant"). Finally, notes that simply report what Plaintiff told hospital staff are not persuasive evidence and the ALJ was under no obligation to give the comments enough weight to find her disabled.

The record does not support Plaintiff's assertions of debilitating depression, and the ALJ adequately analyzed her mental health issues. (Tr. at 119-22.) Ms. Barbeau's February 2010 diagnosis was the first depression diagnosis in the record. (Tr. at 365.) Even during that appointment, however, Plaintiff's mood was appropriate. (Tr. at 363.) As the ALJ pointed out, Ms. Barbeau eventually dropped this diagnosis. (Tr. at 119.) In November 2011, she assessed anxiety, but not depression, (Tr. at 457), and by January 2012 she determined that Plaintiff's insight and memory were intact and she was properly oriented. (Tr. at 467.) Plaintiff's mood on that date betrayed "no depression, anxiety, or agitation," Ms. Barbeau concluded. (*Id.*) The ALJ also cited Dr. Douglass's conclusion that Plaintiff's mental issues were not disabling. (Tr. at 120-21.) Other evidence bolsters the analysis.[7] In April 2011, she denied experiencing depression or anxiety, according to Dr. Field's notes. (Tr. at 327.) Reports from the Janes Street Clinic from 2012 did not find any psychiatric abnormalities. (Tr. at 463, 471, 487-88.) The physical therapy session notes

---

[7] "The court may consider evidence in the record, regardless of whether it has been cited by the ALJ." *Blackburn v. Comm'r of Soc. Sec.*, No. 4:11-cv-58, 2012 WL 6764068, at *5 (E.D. Tenn. Nov. 14, 2012) (citing *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir.2001)). *Report & Recommendation adopted by* 2013 WL 53980, at *1 (E.D. Tenn. Jan. 2, 2013). The analysis that follows merely plugs additional facts into the ALJ's analysis, it does not construct new rationales or arguments for the ALJ's action.

report depression and anxiety, but state her cognitive functions remained unimpeded, she was alert and cooperative, and enjoyed a solid support system. (Tr. at 491, 526.) Finally, at the hearing, she denied any mental problems. (Tr. at 137.)

The only evidence to the contrary, which Plaintiff leaves undiscussed, is Dr. Fowler's 2011 opinion. The ALJ's analysis justifies her decision to give that opinion "limited weight." (Tr. at 121.) Dr. Fowler's prior analysis was ambiguous. As the ALJ noted, in 2010 Dr. Fowler found that she could "understand, retain and follow instructions of moderate complexity," concluding she could perform work similar to the job she then had. (Tr. at 392.) Yet, evincing a preoccupation with her physical condition, he added that if her "statements about pain . . . are accurate," then along with her depression they would "interfere with her ability to perform any job consistently right now." (*Id.*) Indeed, many of the notes discuss her physical pain. (Tr. at 388, 391.) Moreover, Dr. Fowler's observations during that session described her normal posture and gait, cooperative and attentive mannerisms, "mostly autonomous" daily activities, organized speech, lack of suicidal thoughts, "fairly stable" mood, and proper orientation. (Tr. at 389-90.)

Dr. Fowler's 2011 opinion more clearly asserted Plaintiff was disabled and was more clearly lacking support. (Tr. at 317.) He still believed she had the cognitive capacity to understand and follow moderately complex instructions.(*Id.*) Her depression had intensified since 2010, he thought, now preventing her from performing routine tasks.(*Id.*) Again Dr. Fowler cited her "ongoing physical problems" as a necessary prop for his conclusion.(*Id.*) The ALJ properly recognized that Dr. Fowler's reliance on Plaintiff's "subjective complaints of physical pain, which is outside his area of expertise," reduced his persuasiveness, especially in light of her questionable credibility. (Tr. at 121.) Additionally, the session notes do not suggest any psychiatric changes

supporting his shifting conclusions. Plaintiff had broken up with her boyfriend and argued with her daughter. (Tr. at 313-14.) By the time of the hearing, however, she had apparently reconnected with her daughter, who continued to assist Plaintiff; Plaintiff also testified she visited her grandchildren. (Tr. at 139-40.)

The only other significant difference in the body of the report is Dr. Fowler's observation that Plaintiff's "autonomy" in daily life had diminished. (Tr. at 314.) The only evidence he cited in support was Plaintiff's statement that she stopped driving after the surgery. (*Id.*) This fails to convince for two reasons, one of which glared Dr. Fowler in the face. Just above the sentence where he determined her autonomy decreased because she no longer drove, Dr. Fowler observed that she "was seen alone for this appointment. She drove herself to the office." (*Id.*) Thus, he spelled out the facts that cast doubt on his assertion. Unknown to him, but also diminishing the cogency of his opinion, are Plaintiff's contemporaneous statements to her physicians that she had "no significant low back pain" and felt much better. (Tr. at 318, 404, 419, 420.) There was no reason for her to stop driving based on her back pain or the surgery. Consequently, the ALJ accorded the opinion appropriate weight.

### 3.    Conclusion

For all these reasons, after review of the record, I suggest that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "'zone of choice' within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035 (quoting *Mullen*, 800 F.2d at 545), as the decision is supported by substantial evidence.

## III.  <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  January 29, 2015             /S PATRICIA T. MORRIS
                                    Patricia T. Morris

United States Magistrate Judge